# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ACUITY, *a Mutual Insurance Company*, ) | |
| ) | |
| ) | |
| Plaintiff / Counter-Defendant, ) | |
| ) | Case No. 16-cv-3683 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| KESSOR ENTERPRISES, LTD. d/b/a ) | |
| SUPERIOR LABOR SOLUTIONS, ) | |
| ) | |
| Defendant / Counter-Plaintiff. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Acuity, a Mutual Insurance Company, brings this diversity suit seeking a declaration that insurance policies Plaintiff issued to Defendant Kessor Enterprises, Ltd., doing business as Superior Labor Solutions, do not provide coverage for the third-party complaint filed against Defendant in an underlying lawsuit pending in New York state court. Defendant brought counterclaims seeking a declaratory judgment that it is entitled to coverage under the insurance policies at issue and alleging that Plaintiff breached the policies by refusing to provide a defense. Before the Court are Plaintiff's motion for summary judgment [31], Defendant's motion for summary judgment [33], and Plaintiff's motion to strike certain paragraphs of Michael Kuehn's affidavit [37]. For the reasons that follow, the Court grants Plaintiff's motion for summary judgment [31], denies Defendant's motion for summary judgment [33], and denies as moot Plaintiff's motion to strike certain paragraphs of Michael Kuehn's affidavit [37]. The Court will enter a final judgment and close the case.

**I.     Background**

The following facts are drawn primarily from the parties' Local Rule 56.1 statements,

[32], [33-1], and [36].[1]  This action is an insurance coverage dispute.  Plaintiff is a Wisconsin company that issued a General Commercial Liability ("CGL")[2] policy and a Worker's Compensation and Employers' Liability ("WC/EL") policy to Defendant, both of which covered the policy period of May 1, 2012 to May 1, 2013.  [1, at ¶ 1; 32, at ¶¶ 13, 15; 33-1, at ¶¶ 2, 26, 33.]  Defendant is an Illinois corporation that supplies union labor to disaster clean-up and repair projects.  [33-1, at ¶ 1; 41, at 2.]

    A.    The CGL Policy

The CGL policy provides that Plaintiff "will pay those sums that the insured becomes legally obligated to pay as damages because of *bodily injury* or *property damage* to which the insurance applies."  [32, at ¶ 14; 33-1 at ¶ 27 (emphasis in original).]  The policy further states that Plaintiff "will have no duty to defend the insured against any suit seeking damages for bodily injury or property damage to which this insurance does not apply."  [*Id.*]  The policy is limited to bodily injury and property damage "caused by an occurrence that takes place in the coverage territory" and "occurs during the policy period."  [*Id.*]

The CGL policy includes a Contractual Liability Exclusion and an Employer's Liability Exclusion.  The Contractual Liability Exclusion excludes from coverage claims for "[b]odily injury or property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."  [32, at ¶ 14; 33-1, at ¶ 29.]  However, there are two exceptions to the Contractual Liability Exclusion: the exclusion does not apply to liability for damages (1) "[a]ssumed in a contract or agreement that is an *insured contract*," or (2) "that the insured would have in the absence of the contract or agreement."  [33-1, at 29.]

---

[1] The Court notes that in lieu of filing a response to Plaintiff's Statement of Material Facts [32], Defendant states that it "does not dispute the facts asserted by [Plaintiff] in conjunction with its motion for summary judgment."  [41, at 1.]

[2] The Court adopts the parties' use of this abbreviation.

The Employer's Liability Exclusion excludes coverage for bodily injury to an "employee of the insured arising out of and in the course of: (a) [e]mployment by the insured; or (b) [p]erforming duties related to the conduct of the insured's business." [32, at ¶ 14; 33-1 at ¶ 32.] The exclusion applies "whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury." [*Id.*] However, there is an insured contract exception, which indicates that the Employer's Liability Exclusion "does not apply to liability assumed by the insured under an *insured contract*." [32, at ¶ 14; 33-1, at ¶ 32.] An insured contract is defined as "[t]hat part of any other contract or agreement pertaining to your business * * * under which [the insured] assume[s] the tort liability of another party to pay for bodily injury or property damage to a third person or organization." [32, at ¶ 14; 33-1, at ¶ 30.] Tort liability is defined as "a liability that would be imposed by law in the absence of any contract or agreement." [*Id.*]

### B. The WC/EL Policy

There are three key parts to the WC/EL policy. Part One of the policy applies to the Workers' Compensation Law of Illinois, Wisconsin, and Michigan. [32, at ¶ 16/] Part Two of the policy provides Employers' Liability Insurance and "applies to work in each state listed in Item 3.A." [*Id.*] Item 3A lists the following states: Illinois, Wisconsin, and Michigan. [1, Exhibit F, at 2.] Part Two is entitled "Employers' Liability Insurance" and provides coverage for "bodily injury by accident or bodily injury by disease" but the "bodily injury must arise out of and in the course of the injured employee's employment by [the insured]." [32, at ¶ 17; 33-1, at ¶ 35.] Further, "the employment must be necessary or incidental to [the insured's] work in a state or territory listed in Item 3A of the Information Page." [*Id.*] Part Two contains a Contractual Liability Exclusion, which states, "This insurance does not cover * * * Liability

3

assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner." [32, at ¶ 8.]

Part Three of the policy is entitled "Other States Insurance." Part Three applies "only if one or more states are shown in Item 3C of the Information Page." [32, at ¶ 19; 33-1, at ¶ 36.] Item 3C includes "all states except North Dakota, Ohio, Washington and Wyoming and States designated in Item 3A." [1, Exhibit F, at 2.] Part Three states that "[i]f you begin work in any one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as though that state were listed in 3A." [32, at ¶ 19; 33-1, at ¶ 36.] However, "[i]f you have work on the effective date of this policy in any state not listed in Item 3A [ ], coverage will not be afforded for that state unless [the insurer] is notified within 30 days." [*Id.*] Finally, Part Three, Section B provides the following Notice Condition: "Tell us at once if you begin work in any state listed in Item 3C of the Information Page."

### C. The Underlying Action

The underlying action stems from an injury allegedly suffered by Michael Christie, an employee of Defendant Kessor, at a construction project that took place at Jones Beach Theater on Long Island, New York. On December 6, 2012, Live Nation and BMS-CAT entered into an agreement under which BMS-CAT would provide general contracting services at Jones Beach Theater in New York, which is owned and operated by Live Nation. [32, at ¶ 3; 33-1, at ¶¶ 7–8.] On January 19, 2012, Defendant entered into a contract to provide union labor to BMS-CAT at jobsites including the Jones Beach Theater (the "Master Contract"). [32, at ¶ 4; 33-1, at ¶ 9]. Section 3.1 of the Master Contract provides that Defendant "shall purchase and maintain insurance to fully protect and insure BMS-CAT and [Defendant] from claims of any nature

concerning [Defendant's] actions and inaction pursuant to [Defendant's] performance of the Work." [32, at ¶ 5; 33-1, at ¶ 17.] Defendant first began supplying union laborers to BMS-CAT in New York in mid-to-late November 2012. [33-1, at ¶ 20.] Additionally, Paragraph 4.1 of the Master Contract states that Defendant "shall indemnify and hold harmless BMS-CAT, the customer with whom BMS-CAT contracts for the Project, and/or the owner(s) of the property at which the Project is located, [ ] from and against all claims, actions, liabilities, losses, costs, damages, and expenses * * * sustained or incurred by reason of any act, omission, negligence, or fault by [Defendant], or its agents and employees, or otherwise arising out of or in any manner related to the Services, the Work, or the performance by [Defendant] under the Contract." [*Id.*]

On December 31, 2013, Christie filed a lawsuit entitled *Michael Christie v. Live Nation Concerts, Inc. and BMS-CAT, Inc.* in the Suffolk County, New York Supreme Court under index number 00790/2014 ("the Christie Lawsuit"). [32, at ¶ 1; 33-1, at ¶ 6.] Christie alleged that he had been injured on December 4, 2012 while working as a construction worker at Jones Beach Theater as an employee of Defendant. [33-1, at 7.] In Count I of the underlying lawsuit, Christie brings a negligence claim, alleging that Live Nation and BMS-CAT created a dangerous condition at Jones Beach Theater, causing Christie's injuries. [*Id.* at ¶¶ 10–11.] In Count II, Christie alleges that Live Nation and BMS-CAT violated certain New York State labor laws governing overhead hazards and the operation of hoisting equipment, causing Christie's injuries. [*Id.* at ¶ 12.] The Christie Lawsuit makes no claims or allegations against Defendant Kessor. [33-1, at ¶ 13.] Christie had previously brought a claim against Defendant Kessor under New York's workers' compensation laws, but this claim has been settled. [*Id.*]

On December 18, 2015, Live Nation filed a Third-Party Complaint against Defendant in the Suffolk County, New York Supreme Court under index number 7800992/15 ("the Third-

5

Party Complaint"). [32, at ¶ 6; 33-1, at ¶ 21.] The Third-Party Complaint alleges that "[Christie] claims that on or about December 4, 2012, while an employee of Third-Party Defendant Kessor, he was injured at a construction site commonly known as the Jones Beach Theater in Wantagh, NY." [32, at ¶ 7.] The Third-Party Complaint further alleges that "Defendant/Third-Party Plaintiff Live Nation entered into a written contract with Defendant BMS for Defendant BMS to provide services at Jones Beach Theater" and that Defendant Kessor "was required to perform work at the [Jones Beach Theater] where Plaintiff's accident allegedly occurred, pursuant to a written contract with Defendant BMS." [*Id.* at ¶¶ 8–9.] The Third-Party Complaint brings a claim against Defendant Kessor for Contractual Indemnity: Live Nation seeks indemnity from Defendant Kessor for any damages Live Nation incurs in the Christie Lawsuit pursuant to Paragraph 4.1 of the Master Contract, and alleges that "[Defendant] Kessor failed to procure and maintain at all times commercial liability insurance protecting and indemnifying Defendant/Third-Party Plaintiff Live Nation against any and all claims and liabilities for injury or damage to persons or property occurring upon or in the premises." [32, at ¶ 12, 33-1, at ¶ 23.] In the Third-Party Complaint, Live Nation also seeks common law indemnity from Defendant Kessor for any damages it incurs in the Christie Lawsuit pursuant to common law, and contribution of relative fault for any damages arising from the Christie Lawsuit. [32, at ¶ 10; 33-1, at ¶ 24.]

D. **The New York State Insurance Fund Insurance Policy**

On December 4, 2012, the date of Christie's alleged injury, Defendant Kessor had a workers' compensation insurance policy issued by New York State Insurance Fund, which was effective from May 13, 2012 to May 13, 2013 and provided Workers' Compensation Insurance and Employers' Liability Insurance. [32, at ¶¶ 23–25.] Michael Kuehn, the Vice President of

Defendant Kessor, reported the incident involving Christie to the New York State Insurance Fund on December 10, 2012. [*Id.*, at ¶ 26.] The New York Insurance Fund advised that the Employer's Report of Injury provided by Kuehn was received on December 12, 2012. [*Id.*, at ¶ 27.] On March 14, 2016, the New York State Insurance Fund acknowledged its obligation to defend Defendant Kessor subject to a reservation of rights. [*Id.* at ¶ 28.] The New York State Insurance Fund paid for defense counsel to represent Defendant Kessor in the Live Nation lawsuit because certain claims by Live Nation could fall within the coverage of the New York State Insurance Fund policy. [33-1, at ¶ 53.] However, this defense was discontinued effective December 31, 2016 because the claims to which it applied were dismissed. [*Id.*]

### E. Procedural History

Defendant Kessor requested that Plaintiff Acuity provide a defense to Defendant Kessor of claims by Live Nation in the underlying Third-Party Complaint. Plaintiff refused to provide a defense and denies that coverage exists under the CGL Policy or the EL Policy for such claims. [33-1, at ¶ 37.] The parties filed claims seeking a declaration on whether the insurance policies Plaintiff issued to Defendant provide coverage for the claims against Defendant in the underlying Third-Party Complaint. The parties filed cross-motions for summary judgment [31] and [33], which are fully-briefed and currently before the Court.

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of

material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). However, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

The parties agree that Illinois law governs this diversity action. [31, at 4–5; 41, at 4.] "Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) (citation and internal quotation marks omitted). To determine whether an insurer has a duty to defend its insured, courts will compare the factual allegations of the underlying complaint to the language of the insurance policy. *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 810 (7th Cir. 2010). The Court should not "simply look to the particular legal theory pursued by the claimant, but must focus on the allegedly tortious *conduct* on which the lawsuit is based." *Citizens Ins. Co. of Am. v. Uncommon, LLC*, 812 F. Supp. 2d 905, 910 (N.D. Ill. 2011) (quoting *Amerisure*, 622 F.3d at 815–16) (internal quotation marks omitted). If the facts alleged in the complaint fall within, or potentially within, the policy's coverage, the insurer has a duty to defend. *Amerisure*, 622 F.3d at 810. The Court is to construe the policy terms and the allegations in the complaint in favor of the insured, and any doubts and ambiguities are resolved against the insurer. *Id.* at 811. "However, the general rules that favor the insured must yield to the paramount rule of reasonable construction which guides all contract interpretations." *Id.* (citation and internal quotation marks omitted).

An insurer has no duty to defend if an exclusionary provision unambiguously precludes

coverage. *United States Fidelity & Guaranty Co. v. Wilkins Insulation Co.*, 550 N.E.2d 1032, 1039 (Ill. App. Ct. 1989). Under Illinois law, an insured party bears the burden of proving that its claim falls within the insuring agreement, the insurer has the burden of proving that an exclusion applies, and insured party, in turn, has the burden proving that an exception to an exclusion restores coverage. *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 348 (7th Cir. 2010); *The PrivateBank & Tr. Co. v. Progressive Cas. Ins. Co.*, 2004 WL 1144048, at *3 (N.D. Ill. May 18, 2004), aff'd, 409 F.3d 814 (7th Cir. 2005) (citing *Reedy Indus., Inc. v. Hartford Ins. Co. of Ill.*, 715 N.E.2d 728, 731–32 (Ill. App. Ct. 1999).

## III. Analysis

### A. CGL Policy

The parties agree that the CGL policy provides coverage for bodily injury and that Christie's lawsuit is premised on his allegations of bodily injury. Plaintiff argues, however, that the Employer's Liability Exclusion precludes coverage for the Third-Party Complaint filed against Defendant. The Employer's Liability Exclusion excludes coverage for bodily injury to an "employee of the insured arising out of and in the course of: (a) [e]mployment by the insured; or (b) [p]erforming duties related to the conduct of the insured's business." [32, at ¶ 14; 33-1 at ¶ 32.] It is undisputed that Christie was an employee of Defendant at the time of his alleged injury and claims to have been injured in the course of his employment. The main issue, then, is whether the insured contract exception to the Employer's Liability Exclusion applies.[3]

The CGL policy states that the Employer's Liability Exclusion "does not apply to

---

[3] An employer's liability exclusion "recognizes that general liability coverage is unnecessary for an employer whose employee is injured in the course of his employment since the workman's compensation system (and the required workman's compensation insurance coverage) covers such an injury." *Archer Daniels Midland Co. v. Burlington Ins. Co. Grp.*, 785 F. Supp. 2d 722, 730 (N.D. Ill. 2011) (citation and internal quotation marks omitted). Such exclusions are commonly included in in commercial general liability policies. *Starnet Ins. Co. v. South West Industries, Inc.*, 2010 WL 1337690, at *2 (N.D. Ill. Mar. 30, 2010).

9

liability assumed by the insured under an *insured contract*." [32, at ¶ 14; 33-1, at ¶ 32.] An insured contract is defined in the policy as "[t]hat part of any other contract or agreement pertaining to your business * * * under which [the insured] assume[s] the tort liability of another party to pay for bodily injury or property damage to a third person or organization." [32, at ¶ 14; 33-1, at ¶ 30.] The parties dispute whether the Master Contract between Defendant and BMS-CAT is an "insured contract" under the CGL policy.

Under the language of the CGL policy, an insured contract is one in which Defendant assumes the tort liability "of another party." Thus, the Court must look to the terms of the Master Contract to see if Defendant Kessor has assumed the tort liability of BMS-CAT and Live Nation. Paragraph 4.1 of the Master Contract states that Defendant "shall indemnify and hold harmless BMS-CAT, the customer with whom BMS-CAT contracts for the Project, and/or the owner(s) of the property at which the Project is located, [ ] from and against all claims, actions, liabilities, losses, costs, damages, and expenses * * * sustained or incurred by reason of any act, omission, negligence, or fault by [Defendant], or its agents and employees, or otherwise arising out of or in any manner related to the Services, the Work, or the performance by [Defendant] under the Contract." [*Id.*] Thus, under the terms of the Master contract, Defendant has not assumed the tort liability of BMS-CAT and Live Nation; rather, Defendant has simply agreed to indemnify BMS-CAT and Live Nation for claims stemming from Defendant Kessor's negligence. Notably, the Master Contract does not contain any language indicating that Defendant would indemnify BMS-CAT and Live Nation for *their* negligence, as compared to Defendant Kessor's own negligence. See *Century Sur. Co. v. Bucks, Inc.*, 2014 WL 11776967, at *6 (S.D. Ill. July 10, 2014) (applying Illinois law and explaining that "[o]nly if [ ] the contract unequivocally indemnifies a party against *its own negligence* will an insured contract exception"

apply and that "[a]n indemnity agreement will not be construed as indemnifying a party against *its own negligence* unless such a construction is required by the contract's clear and explicit language, or such intention is expressed in unequivocal terms" (emphasis added)); *Va. Sur. Co. v. Northern Ins. Co.*, 866 N.E.2d 149, 158 (Ill. 2007) (subcontractor's agreement to indemnify a general contractor and hold it harmless for claims arising out of and resulting from the performance of the subcontractor's work was not an "insured contract" within the meaning of the exception); *Tatar v. Maxon Const. Co.*, 294 N.E.2d 272, 274 (Ill. 1973) (holding that indemnity agreement providing that subcontractor would indemnify general contractor "against all [ ] claims * * * arising out of, or connected with, accidents, injuries, or damages, which may occur upon or about the [s]ubcontractor's work" did not provide general contractor with indemnity against claims arising out of his own negligence). The Court also notes that under Illinois law, it is generally held that an indemnity contract will not be construed an indemnifying the indemnitee against its own negligence unless such a construction is required by the clear and explicit language of the contract, or such intention is expressed in unequivocal terms. *Bituminous Cas. Corp v. Plano Molding Co.*, 33 N.E.3d 658, 664 (Ill. App. Ct. 2015). Since the Master Contract does not indicate that Defendant has assumed the tort liability of "another party," (*i.e.,* Live Nation), the Master Contract is not an insured contract, and the Employer's Liability Exception applies to exclude coverage under the CGL policy.

Defendant make several arguments for why the insured contract exception should apply, none of which the Court finds persuasive. Defendant argues that the language of the Master Contract should be read to provide that it assumed the tort liability of another party, Live Nation, to pay for bodily injury or property damage to a third party, Christie. According to Defendant, it assumed liability for claims "arising out of or in any manner related to" its performance under

11

the Master Contract," which include claims arising out of the negligence or other fault by Live Nation. This is not a reasonable interpretation of the plain language of the Master Contract. Defendant does not explain how "Defendant's performance under the contract" can be read to include Live Nation's negligence. The Master Contract clearly refers to Defendant Kessor's acts, omissions, negligence, or fault and Defendant Kessor's services, work, and performance under the contract, and a natural reading of the contract language does not indicate that this includes any negligence or fault of Live Nation.

Defendant also argues that the claims made by Live Nation in the Third-Party Complaint may have been brought under the Master contract, but they "substantially mirror the types of claims that can be made under New York common or statutory law even without the Master Contract as a basis for the claim." Defendant contends that the Master Contract provides indemnity to Live Nation for tort liability, including Live Nation's own negligence, statutory violations, or other fault, and thus the Master Contract is an insured contract.

This argument appears to be a misplaced attempt to invoke the second exception to the Contractual Liability Exclusion, which indicates that the exclusion does not apply to liability for damages "that the insured would have in the absence of the contract or agreement." [33-1, at 29.] However, this exception does not apply to the Employer's Liability Exclusion. Since the Court concludes that the Employer's Liability Exclusion applies and the insured contract exception does not apply, the Court need not conduct an analysis under the Contractual Liability Exclusion.[4] Even if this exception to the Contractual Liability Exclusion applies, the Employer's

---

[4] Defendant also offers a cursory argument that although Illinois law controls construction of the insurance policies at issue, the interpretation of the Master Contract is governed by Texas law, as indicated by a choice of law provision of the Master Contract. [See 41, at 5.] However, Defendant does not develop an argument as to how the analysis would be any more favorable to its position under Texas law. To the extent that this argument is not waived, see *United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016), it must fail because Texas law is even more strict than Illinois law

12

Liability Exclusion still bars coverage for all of the claims in the Third-Party Complaint. Thus, the CGL policy does not provide coverage for the Third-Party Complaint filed against Defendant Kessor, and Plaintiff has no duty to defend under the CGL policy.

      B.      **WC/EL Policy**

Next, the parties dispute whether coverage is available under the WC/EL policy. Part Two of the WC/EL policy provides Employers' Liability Insurance and applies to work in each state listed in item 3A, which are Illinois, Wisconsin, and Michigan. Part Two contains a Contractual Liability Exclusion, which states that the insurance does not cover liability assumed under a contract. Part Three of the policy indicates that if Defendant begins work in any state except North Dakota, Ohio, Washington, Wyoming, Illinois, Wisconsin, and Michigan after the effective date of the policy and is "not insured or self-insured for such work, all provisions of the policy will apply as though that state were listed in 3A."

Plaintiff argues that coverage is not available under Part Two because Christie's alleged injury took place in New York, which is not a state listed in item 3A. Plaintiff further argues that Part Three does not apply because Defendant Kessor had in place other Workers' Compensation / Employers Liability coverage issued by the New York State Insurance Fund and applicable on the date of the accident. Defendant admits that it obtained a Workers' Compensation / Employers Liability policy from the New York State Insurance Fund. However, Defendant

---

regarding the indemnification of another party against its own negligence. Under Texas law, "a party cannot be indemnified for its own negligence absent an unmistakable, unambiguous and explicit statement within the four corners of the contract that such is the intent of the parties." *Enron Corp. Sav. Plan v. Hewitt Assocs., L.L.C.*, 611 F. Supp. 2d 654, 664 (S.D. Tex. 2009). Thus, even if the Court were to apply Texas law, the Master Contract would not be deemed an insured contract. See *id.* (applying Texas law and explaining that "[g]eneral, broad statements of indemnity are not effective to shift the consequences of the indemnitee's own negligence to the indemnitor." (citing *Quorum Health Records, LLC v. Maverick County Hosp. Dist.*, 308 F.3d 451, 461 (5th Cir. 2002) (internal quotation marks omitted)).

argues that the New York State Insurance Fund policy denies coverage for any contract claims in the Third-Party Complaint, and thus it is uninsured "for at least a portion" of the Third-Party Complaint. According to Defendant, to the extent that the New York State Insurance Fund has refused to defend or provide coverage, Defendant is uninsured in New York under Part Three, and thus the Employers' Liability Insurance in Part Two applies "as though [New York] were listed in 3A."

Again, the Court is not persuaded by Defendant's arguments. Defendant concedes that it was insured through the New York State Insurance Fund Workers' Compensation / Employers Liability policy. In fact, the New York State Insurance Fund actually provided a defense for Defendant Kessor against Live Nation's Third-Party Complaint.[5] Because Defendant was thus "insured or self-insured" for the work it began in New York after the effective date of the WC/EL policy issued by Plaintiff, Part Three of the WC/EL does not apply, and the Third-Party Complaint does not fall within the WC/EL policy. Even if the New York State Insurance Fund policy denies coverage for any contract claims in the Third-Party Complaint, this does not save the day for Defendant because the WC/EL also contains a Contractual Liability Exclusion, which states that the insurance does not cover liability assumed under a contract.

Finally, Defendant contends, without citing any authority, that if Plaintiff claims that the limited coverage provided by the New York State Insurance Fund absolves it of any duty under its policy, Plaintiff must resolve this dispute with the New York State Insurance Fund. Again, the Court is not convinced. Under Illinois law, an insured party bears the burden of proving that its claim falls within the insuring agreement. *PrivateBank & Trust Co.*, 2004 WL 1144048, at *3. Defendant Kessor has not met its burden of proving that the claims made by Live Nation

---

[5] Plaintiff indicates that this defense was discontinued effective December 31, 2016 because the claims to which it applied were dismissed. [33-1, at ¶ 53.] This fact is deemed admitted, as Defendant did not file a response to Plaintiff's Local Rule 56.1 State of Facts.

against Defendant Kessor in the Third-Party Complaint fall within the scope of the WC/EL policy. Plaintiff has no obligation to pay a claim for which there is no coverage under its policy only to then pursue relief from the New York State Insurance Fund.

In sum, the Court grants summary judgment in favor of Plaintiff and declares that coverage does not exist under the CGL policy or the WC/EL policy, Plaintiff has no duty to defend, and Defendant's breach of contract claims against Plaintiff for breaching the CGL and WC/EL policies must fail.

### C. Motion to Strike

Plaintiff also brings a motion to strike paragraphs 13–19 of Michael Kuehn's affidavit, arguing that Kuehn's assertions in these paragraphs rely on inadmissible hearsay. In the paragraphs at issue, Kuehn, the Vice President of Defendant Kessor, avers that he contacted Plaintiff by telephone and indicated that Defendant was starting to do business in New York. [33-2, at ¶¶ 13–14.] Kuehn further states that "an individual identifying themselves as answering on behalf of Acuity" first advised him that a certificate of insurance for worker's compensation coverage would be sent to the appropriate authorities in New York, but then advised him in a later phone call that Plaintiff was not registered with the State of New York as a worker's compensation insurance carrier and was not set up to file proof of insurance directly with the State of New York. [*Id.* at ¶¶ 15, 18.]

Plaintiff argues that Kuehn's account of what Plaintiff allegedly told him over the phone is hearsay and does not qualify as a statement by a party opponent under Federal Rule of Evidence 801(d)(2)(D) because Kuehn's affidavit does not provide any information about who or even what department he spoke with on the phone, what phone number he called, or the specific date on which the conversation took place. Defendant responds that these statements are not

15

offered for the truth of the matter, and rather, these paragraphs of Kuehn's affidavit are evidence that Plaintiff had notice that Defendant was working in the State of New York.

The issue of whether Defendant provided Plaintiff with notice that it was beginning work in New York would be relevant if Defendant was uninsured for its work in New York, because Part Three of the WC/EL policy contains a Notice Condition that states: "Tell us at once if you begin work in any state listed in Item 3C of the Information Page." However, since the Court already has concluded that Part Three "Other States Insurance" of the WC/EL policy does not apply because Defendant was insured by the New York State Insurance Fund policy, the issue of notice is irrelevant to the Court's summary judgment determination. Thus, Plaintiff's motion to strike [37] is denied as moot.

### IV. Conclusion

For the reasons stated above, the Court grants Plaintiff's motion for summary judgment [31], denies Defendant's motion for summary judgment [33], and denies as moot Plaintiff's motion to strike certain paragraphs of Michael Kuehn's affidavit [37]. The Court will enter a final judgment and close the case.

Dated: August 23, 2017

Robert M. Dow, Jr.
United States District Judge